# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### ROCK ISLAND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.        05-40024-02 |
| | ) | |
| ALI HIJAZI, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>O R D E R  &  O P I N I O N</u>

This case is before the Court pursuant to a writ of mandamus order issued July 1, 2011, from the Seventh Circuit to promptly rule on Defendant Hijazi's motions to dismiss (Docs. 15, 131, 174) the Indictment pending against him. Before the Court are Defendant's Motion to Dismiss Indictment (Doc. 15) and Memorandum in Support (Doc. 16), Defendant's Motion to Dismiss Second Superseding Indictment (Doc. 131) and Memorandum in Support (Doc. 180), Defendant's Motion to Dismiss Based on Sixth Amendment Right to a Speedy Trial (Doc. 174) and Memorandum in Support (Doc. 175), Memorandum of Amici Curiae in Support of Defendant's Motion to Dismiss Based on Lack of Jurisdiction (Doc. 166), the Government's Consolidated Response to Defendant Hijazi's Motions to Dismiss the Indictment (Doc. 217), and Defendant's Reply Brief in Support of his Motions to Dismiss (Doc. 222). On May 7, 2010, Magistrate Judge Cudmore issued a Report and Recommendation recommending that Defendant's Motions to Dismiss be denied (Doc. 230). Defendant filed Objections to the Report and

Recommendation (Doc. 233), the Government filed a Response to Defendant's Objections (Doc. 235) and Defendant filed a Reply thereto (Doc. 238).[1]  For the following reasons, the Report and Recommendation is AFFIRMED and Defendant's Motions to Dismiss are DENIED.

## BACKGROUND

On March 16, 2005, the United States Government ("Government") charged Defendant Ali Hijazi ("Hijazi") and Jeff Mazon ("Mazon") with violations of the Major Fraud Act, 18 U.S.C. § 1031(a), the wire fraud statute, 18 U.S.C. § 1343, and the aiding and abetting statute, 18 U.S.C. § 2.  (Doc. 1).  On May 20, 2005, the Government filed a Superseding Indictment against Hijazi and Mazon (Doc. 21), and on August 3, 2006, it filed a Second Superseding Indictment (Doc. 59).  The Second Superseding Indictment alleges the following information, taken as true for purposes of ruling on the pending motions to dismiss.  *See United States v. White*, 610 F.3d 956, 959 (7th Cir. 2010).

In late 2001, the U.S. Army contracted with Kellogg Brown & Root Services ("KBR"), an American company, to provide property and services to the military at locations around the world, including Kuwait.  (Doc. 59 ¶¶ 3-8).  One service that KBR contracted to perform was to store and dispense fuel at the Aerial Port of Debarkation ("APOD") in Kuwait.  (Doc. 59 ¶ 11).  The APOD was the airport used

---

[1] Also before the Court are Defendant's Offering of Additional Document and Citation of New Authority in Support of his Motion to Dismiss the Second Superseding Indictment (Doc. 161), Defendant's Submission of Seventh Circuit Briefs and Other Appellate Filings in Support of Motions to Dismiss (Doc. 215), a Supplemental Authority filed by the Government (Doc. 225) and Defendant's Response thereto (Doc. 227), and Defendant's Notice of New Supreme Court Authority (Doc. 236) and the Government's Response thereto (Doc. 237).

by the United States military for military operations in Kuwait.  (Doc. 59 ¶ 11).  As was common practice for KBR, it sought out a subcontractor to perform work related to the storage and dispensation of fuel at the APOD; the subcontractor would invoice KBR for their work, which KBR would then pay and subsequently invoice the United States.  (Doc. 59 ¶¶ 8, 20).

From December 2002 through June 2003, Jeff Mazon was the Procurement, Materials, and Property Manager for KBR stationed in Kuwait.  (Doc. 59 ¶ 12).  Accordingly, it was his duty to negotiate, execute, and administer subcontracts such as the one for fuel storage and dispensation at the APOD.  (Doc. 59 ¶¶ 12, 20).  On February 2, 2003, Mazon solicited bids by electronic mail from potential subcontractors for fuel tankers to store and dispense fuel for a six month period at the APOD; KBR had estimated that the cost of the subcontract would be $685,050.  (Doc. 59 ¶ 20).  One of the bids received by Mazon was from LaNouvelle General Trading & Contracting Co. ("LaNouvelle"), a Kuwaiti company of which Hijazi[2] was the managing partner.  (Doc. 59 ¶¶ 13, 21).  The LaNouvelle bid was approximately $1,673,100.  (Doc. 59 ¶ 21).  Mazon received one other bid for $1,891,890.  (Doc. 59 ¶ 21).

Prior to awarding the subcontract, Mazon substantially inflated both bids.  (Doc. 59 ¶ 22).  He raised LaNouvelle's bid to approximately $5,521,230, and the competing bid to approximately $6,243,237.  (Doc. 59 ¶ 22).  On February 14, 2003,

---

[2] Hijazi is a citizen of Lebanon and lifelong resident of Kuwait.  He has traveled to the United States only once, in 1993, under circumstances unrelated to this case.  His company, La Nouvelle, is a Kuwaiti company with no American ownership interests.  (Doc. 233 at 6).

Mazon and Hijazi signed a subcontract ("Subcontract 39") under the inflated price, which was more than $4.8 million more than KBR's estimate for the work, and more than $3.8 million more than LaNouvelle's original bid.  (Doc. 59 ¶ 23).  Hijazi signed Subcontract 39 knowing that the price was inflated and that Hijazi would pay Mazon money for Mazon's favorable treatment of LaNouvelle.  (Doc. 59 ¶ 16). Subcontract 39 indicates that the United States Government was the Owner, for whom work was being performed, and that all escorts and security monitors and fuel costs incurred in the sublet work would be covered by the United States.  (Doc. 226-1 at 4-5).

From March 2003 through August 2003, Mazon and Hijazi caused LaNouvelle to submit six different invoices to KBR for payment under Subcontract 39 in the total amount of $5,521,230, which was the inflated price.  (Doc. 59 ¶ 26). KBR paid LaNouvelle in full on each of these six invoices.  (Doc. 59 ¶ 26).  Mazon and Hijazi then caused KBR to submit four invoices to the United States Government for the costs incurred pursuant to Subcontract 39, which the Government paid in September and December of 2003.  (Doc. 59 ¶ 27).

Sometime in September 2003, Hijazi gave a $1 million draft to Mazon in exchange for Mazon's favorable treatment of LaNouvelle.  (Doc. 59 ¶ 28).  The men also executed a promissory note as a ruse to make the $1 million payment appear to be a loan from Hijazi to Mazon.  (Doc. 59 ¶ 28).  However, on September 24, 2003, Hijazi sent Mazon an e-mail telling him that Hijazi considered "this whole lown [sic] (principal and interest) as totally your money . . . ."  (Doc. 59 ¶ 29).  On October 1,

2003, Mazon tried unsuccessfully to deposit the $1 million in a U.S. bank. (Doc. 59 ¶ 30). On October 9, 2003, Hijazi sent Mazon a second e-mail, instructing him on how to deposit the money. (Doc. 59 ¶ 31). Hijazi told Mazon to open an offshore account with three different financial institutions and to deposit around $300,000 in each, under the auspices that it was from "consultancy work, business associates [sic], salaries abd [sic] bonuses, or any other reasoning." (Doc. 59 ¶ 31). On October 28, 2003, Mazon again attempted to deposit the $1 million at a second financial institution in the United States. (Doc. 59 ¶ 32).

In November 2003, a KBR investigator questioned Hijazi about Subcontract 39. (Doc. 59 ¶ 33). The next day, Hijazi sent a third e-mail to Mazon stating "Please when you call your ex-friends in Kuwait [sic] please be very careful [sic] on what you say." (Doc. 59 ¶ 33). Mazon opened this e-mail while he was in the United States. (Doc. 59 ¶ 33).

Shortly after the original Indictment was returned against him, Hijazi voluntarily surrendered himself to authorities in Kuwait. (Doc. 133 at 2). However, he was quickly released and his posted bond was returned to him. (Doc. 133 at 2). On May 3, 2005, Hijazi, via American counsel, filed his first Motion to Dismiss the Indictment (Doc 15), claiming that his prosecution violated principles of extraterritoriality, international law, and due process. (Doc. 16). Rather than substantively respond to his Motion to Dismiss, the Government filed a Motion to Strike (Doc. 20), arguing that because Hijazi had not yet appeared for arraignment, the Court should not entertain his motion. After receiving a Report and

Recommendation from Magistrate Judge Gorman (Doc. 30), this Court determined that it would not strike Hijazi's Motion to Dismiss, however it would defer its ruling until such time as Hijazi appeared for arraignment.  (Doc. 36).[3]

Approximately one year later, on August 3, 2006, the Government filed the Second Superseding Indictment against Hijazi.  (Doc. 53).  On December 21, 2007, Hijazi filed a Motion to Dismiss the Second Superseding Indictment (Doc. 131).  In this Motion, Hijazi raised the same three objections as he did to the original Indictment, and inserted two additional arguments: 1) that the Defense Cooperation Agreement between the United States and Kuwait barred his prosecution, and 2) that his case should be dismissed due to lack of prosecution. (Doc. 180).  Again, the Government decided not to respond to the merits of Defendant's arguments and instead filed a Motion to Stay Ruling and Hold in Abeyance (Doc. 136).  On September 4, 2008, this Court entered another Order in which it indicated that it would not consider Defendant's motions to dismiss until such time as he appeared for arraignment (Doc. 178).[4]

---

[3] The Government made several attempts to obtain Hijazi after the Indictment was returned against him.  In April 2005, the U.S. directed the International Criminal Police Organization ("INTERPOL") to issue a "red notice" on Hijazi, which "calls on member nations to arrest Hijazi if he enters their jurisdiction and, if possible, to extradite him to the U.S."  (Doc. 217 at 48).  Several months later, in September 2005, the Government made a formal request to the Kuwaiti Government to turn over Hijazi, but Kuwait refused and demanded that the charges against him be dropped.  (Doc. 230 at 6).  Because Kuwait refuses to turn over Hijazi, and Hijazi refuses to leave Kuwait (which he is under no legal obligation to do), the Government has been unable to bring him before the Court.

[4] One day before the Court entered this Order, Hijazi also filed his Motion to Dismiss Based on Sixth Amendment Right to Speedy Trial (Doc. 174).

On December 11, 2009, the United States Court of Appeals for the Seventh Circuit granted Hijazi a writ of mandamus, and ordered this Court to rule upon Hijazi's pending motions to dismiss.  (Doc. 213).[5]  Although Hijazi had invited the Seventh Circuit to also rule upon the merits of his motions, the Court expressly declined to do so.  *In re Hijazi*, 589 F.3d 401, 403 (7th Cir. 2009).  This Court referred Defendant's Motions to Magistrate Judge Cudmore, who entered a Report and Recommendation recommending that they be denied.  (Doc. 230).  Hijazi timely filed Objections (Doc. 233), to which the Government responded (Doc. 235), and the matter is now ripe for review by this Court.  In his Objections, Hijazi claims that the Report and Recommendation erred for four main reasons:  1) the R&R erred in concluding that the Court has jurisdiction over Hijazi; 2) the R&R erred in construing the Major Fraud Act and the wire fraud statute to apply extraterritorially to Hijazi; 3) the R&R erred in finding that the Defense Cooperation Agreement does not bar this prosecution; and 4) the R&R erred in concluding that the long pre-trial delay does not violate Hijazi's right to a speedy trial.  (Doc. 233).[6]

---

[5] In the meantime, this Court presided over two trials for Mazon pursuant to the Second Superseding Indictment, both of which resulted in hung juries. (Minute Entries of 4/30/08 & 10/20/08).  Ultimately, the Government and Mazon reached a plea agreement under which the Government filed a misdemeanor false statement charge against Mazon in a separate case, to which he pled guilty in exchange for the dismissal of all charges in this case.  (Docs. 210 & 215).

[6] Hijazi also argues that the Magistrate Judge did not give due deference to the Seventh Circuit's opinion in *In re Ali Hijazi*, 589 F.3d 401 (7th Cir. 2009), which he claims has become the "law of the case."  While the Court will specifically address Hijazi's concerns with the Magistrate's treatment of the Seventh Circuit opinion where they are relevant, as a general matter the Court notes that the Seventh Circuit expressly declined to rule on the merits of Hijazi's motions, and its

A district court reviews *de novo* any portion of a Magistrate Judge's R&R to which an objection has been made. FED. R. CRIM. P. 59(b)(3).  "The district judge may accept, reject, or modify the recommendation, receive further evidence, or resubmit the matter to the magistrate judge with instructions."  *Id.*  Accordingly, the Court will address each of Hijazi's objections in turn.

## I.      This Court's Jurisdiction Over Hijazi

Hijazi argues that the R&R erred in finding that the Court has jurisdiction over him because: 1) he has minimal contacts with the United States and the contacts of Mazon may not be imputed to him; 2) jurisdiction violates his due process rights; and 3) jurisdiction is precluded by the dictates of international law. As will be discussed below, the Court finds that the statutes under which Hijazi has been charged are to apply extraterritorially, such that none of his conduct needed to take place within the United States for jurisdiction to be proper.  *See United States v. Moncini*, 882 F.2d 401, 403 (9th Cir. 1989) ("Jurisdiction is proper if the offense, or part of the offense, occurred within the United States . . . Alternately, jurisdiction may be proper *even if no part of the offense occurred in the United States,* if grounds for exercising extraterritorial jurisdiction are present." (emphasis added)).  Further, the Court finds that due process concerns are nearly identical to international law concerns, both of which require for jurisdictional purposes that Hijazi's conduct is alleged to have had, or was intended to have had a substantial effect within the

---

discussion was directed solely at determining whether a ruling was necessary, not on what that ruling should be.  *See In re Hijazi*, 589 F.3d at 403 ("We have concluded, however, that the district court . . . is in a better position to address the merits in the first instance, and so we decline that invitation [to rule on the merits].").

United States, or was directed against the security of the state.    Therefore, all three of these questions can be determined by an analysis of whether Hijazi's conduct was such that he can fairly be prosecuted pursuant to international law.[7]

### A. Due Process Concerns

In his Motion to Dismiss the Second Superseding Indictment, Hijazi argues that the exercise of criminal jurisdiction over him would violate due process.  (Doc. 180 at 27).  Hijazi bases his initial argument upon the due process standard created by the Supreme Court for civil cases in *Ashai Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 112 (1987).    Accordingly, he claims that "for the exercise of jurisdiction over a foreign defendant to comport with due process, there must be a 'substantial connection between the defendant and the forum' based on 'an action of the defendant purposefully directed toward the forum state.'" (Doc. 180 at 28 (quoting *Ashai*, 480 U.S. at 112)).  While Hijazi recognizes that this standard had only been applied in the civil context, he claims that it could be adopted in his criminal case, because, if anything, "Due Process should provide greater protection in this context."  (Doc. 180 at 28).  Hijazi also relies on civil cases to argue that he did not purposefully direct any actions towards the United States, and thus that it cannot establish jurisdiction over him.[8]

---

[7] As will be discussed, this is also in line with the Seventh Circuit's direction to consider "how much is enough?" for Hijazi to be prosecuted in the United States. *See In re Hijazi*, 589 F.3d at 412.

[8] The Court finds Hijazi's reliance upon civil cases to be inapposite.  Criminal jurisdiction is proper regardless of Hijazi's contacts with the United States so long as the charging statutes apply extraterritorially, and jurisdiction is in accordance with international law.

In its Consolidated Response, the Government counters that the appropriate due process analysis in a criminal context such as this is whether the extraterritorial prosecution of a foreign defendant is "arbitrary or fundamentally unfair." (Doc. 217 at 39 (quoting *United States v. Yousef*, 327 F.3d 56, 111-12 (2d Cir. 2003)). The Government goes on to point out that different courts have interpreted this language differently, with the Second and Ninth Circuits applying a test of whether there is a "sufficient nexus" between the defendant and the United States, *Yousef*, 327 F.3d at 111-12; *United States v. Davis*, 905 F.2d 245, 248-49 (9th Cir. 1990), and others looking to principles of international law, *United States v. Cardales*, 168 F.3d 548, 553 (1st Cir. 1999); *United States v. Martinez-Hidalgo*, 993 F.2d 1052, 1056 (3rd Cir. 1993). (Doc. 217 at 39).

Neither the Seventh Circuit nor the Supreme Court have explicitly addressed due process requirements in the context of criminal jurisdiction over a foreign defendant. However, in its Opinion in this case, the Seventh Circuit indicated that this Court should look to principles of international law to determine whether Hijazi's contacts with the United States were sufficient to support his prosecution. *In re Hijazi*, 589 F.3d at 411-12. After examining the alleged contacts between Hijazi and the United States, the Seventh Circuit posited: "Critical to the decision of whether these contacts are adequate to support the U.S. proceeding is the question of 'how much is enough?'" *Id.* at 412. The Court immediately went on to say, "The Restatement (Third) of Foreign Relations Law . . .. takes the position that 'subject to § 403, a state has jurisdiction to prescribe law with respect to . . .

conduct outside its territory that has or is intended to have substantial effect within its territory.'" *Id.* Given this language by the Seventh Circuit and the fact that numerous other courts have applied principles of international law to the determination of whether due process was satisfied, the Court finds the appropriate due process analysis in this case to be performed under the rubric of international law.[9]   Thus, it will address Hijazi's due process and international law concerns at the same time.

### B. International Law Concerns

#### i. Substantial, Direct, Foreseeable Effect upon United States

Section 402 of the Restatement Third of Foreign Relations Law provides that, "Subject to § 403, a state has jurisdiction to prescribe law with respect to . . . (1)(c) conduct outside its territory that has or is intended to have substantial effect within its territory; . . . ; and (3) certain conduct outside its territory by persons not its nationals that is directed against the security of the state or against a limited class of other state interests."   These principles are known as the objective territorial theory, and the protective theory, respectively.   "When an allegedly criminal act is performed *by an alien* on *foreign soil* courts in the United States have long held that if jurisdiction is to be extended over that act, it must be supported by either the Protective or the Objective territorial theory."   *United States v. Columba-Colella¸* 604 F.2d 356, 358 (5th Cir. 1979) (emphasis added). This principle can be traced back all the way back to Justice Holmes, who stated in *Strassheim v. Daly*, 221 U.S.

---

[9] Magistrate Judge Cudmore analyzed whether Hijazi's prosecution comported with due process under all three standards.  (Doc. 230 at 36-38).

280 (1911), "Acts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, justify a state in punishing the cause of the harm as if he had been present at the effect, if the state should succeed in getting him within its power."

Accordingly, to satisfy the first requirement under international law, the Indictments must allege that Hijazi's actions were intended to have a substantial effect within the United States, or that they were directed against the security of the state, or other state interests. The parties and the Magistrate spent considerable time discussing whether the conduct of Mazon can be attributed to Hijazi for purposes of examining Hijazi's conduct. As will be discussed below, the Court believes that it can be, however, in its view, the Second Superseding Indictment alleges sufficient conduct of Hijazi himself such that jurisdiction is proper. "An indictment is sufficient if it serves three main functions. It must state the elements of the crime charged, adequately inform the defendant of the nature of the charges, and allow the defendant to plead the judgment as a bar to future prosecutions." *United States v. Singleton*, 588 F.3d 497, 500 (7th Cir. 2009). The allegations in the indictment are taken as true. *United States v. Moore*, 563 F.3d 583, 586 (7th Cir. 2009).

The Second Superseding Indictment alleges that Mazon and Hijazi "devised a scheme to defraud the United States of over $3.5 million by falsely inflating the cost of supplying fuel tankers used to support United States military operations in Kuwait." (Doc. 59 ¶ 1). Hijazi allegedly originally submitted a bid to KBR of about

$1.7 million dollars, but then schemed with Mazon to inflate the bid "to ensure that LaNouvelle would be overpaid." (Doc. 59 ¶ 15). "Mazon and Hijazi signed the subcontract, knowing that the subcontract price was inflated and that Hijazi would pay Mazon money for Mazon's favorable treatment of LaNouvelle." (Doc. 59 ¶ 16). The subcontract, Subcontract 39, indicates the United States as "Owner," provides that the United States will undertake various tasks for the performance of the subcontract, and requires that LaNouvelle maintain insurance coverage which included a "waiver of subrogation to the benefit of Brown & Root, Inc. and the U.S. Government." (Doc. 226 §§ 1.2, 1.5, 8.0, 13.0).[10] After signing Subcontract 39, the Indictment alleges that Hijazi and Mazon "caused LaNouvelle to send inflated invoices to KBR . . . and to receive payment from KBR on those invoices." (Doc. 59 ¶ 17). They also both "caused KBR to submit to the United States Government four invoices for payment for costs KBR incurred in paying the LaNouvelle invoices" which the United States paid on September 15, 16, and 27, and December 17, 2003. (Doc. 59 ¶ 27).

Accordingly, based upon the allegations of the Second Superseding Indictment, Hijazi knowingly schemed to defraud the United States of over $3.5 million, and caused the wires to be used to that effect. As Magistrate Judge Cudmore noted, Hijazi's knowledge that the United States was the ultimate payor on Subcontract 39 is sufficiently alleged in the Second Superseding Indictment, and

---

[10] In its Opinion, the Seventh Circuit stated that "there could be facts the district court needs to explore" and that "the district court is familiar with the developments in Mazon's prosecution." Accordingly, the Court believes it is proper to look to the terms of the Subcontract, which is explicitly referenced numerous times in the Indictment (Doc. 59 ¶¶ 16, 17, 23, 25).

also supported by the terms of Subcontract 39 itself.  (Doc. 233 at 40-44).  In the Court's opinion, this is sufficient to establish that Hijazi's actions were intended to have a substantial effect on the United States, namely the theft of millions of dollars from its treasury.  *See United States v. Bowman*, 260 U.S. 94 (1922); *Columba-Colella*¸ 604 F.2d at 358 (stating that "a state/nation is competent . . . to punish one who has successfully defrauded its treasury, no matter where the fraudulent scheme was perpetrated."). Therefore one of the grounds for jurisdiction pursuant to § 402 has been met.

### ii.  Reasonableness of Jurisdiction

In addition to meeting a basis for jurisdiction pursuant to § 402, in order for Hijazi's prosecution to comport with international law it must also be "reasonable." RESTATEMENT (THIRD) OF FOREIGN RELATIONS § 403(1).  Whether jurisdiction is reasonable is a context specific inquiry, however § 403(2) of the Restatement provides some relevant factors to consider, including:  "(a) the link of the activity to the territory of the regulating state, i.e., the extent to which the activity . . . has substantial direct, and foreseeable effect upon or in the territory; . . . (c) the character of the activity to be regulated; (d) the existence of justified expectations that might be protected or hurt by the regulation; . . . (f) the extent to which the regulation is consistent with the traditions of the international system; [and] (g) the extent to which another state may have an interest in regulating the activity."  The Magistrate considered these factors and found that the exercise of jurisdiction would be reasonable, and this Court agrees.

While Hijazi argues that the application of United States' laws to him is unreasonable, the Court disagrees. As previously discussed, Hijazi's activity had a substantial, direct, and foreseeable effect upon the United States, i.e. the theft of a substantial amount of money from its treasury. Moreover, the allegations of the Second Superseding Indictment and Subcontract 39 make it plausible that Hijazi knew that his actions were to have such an effect, such that they were not unforeseeable to him. Likewise, the character of the activity to be regulated is of profound importance. The United States has a strong interest in protecting itself from fraud. *See Bowman*, 260 U.S. 94 (1922); *Columba-Colella¸* 604 F.2d at 358. This is not a case in which the United States is attempting to prosecute a foreign national for an act taken against a U.S. citizen, or even a U.S. corporation, it is attempting to prosecute Hijazi for actions that were taken against the United States itself. Thus, the concepts of international law that a nation has the right to protect itself from crimes against it surely support jurisdiction here. *See* § 402; 403(2)(f).

Finally, although Hijazi contends that prosecuting him interferes with Kuwait's sovereignty, and Kuwait agrees, the Court does not see how the Government's efforts to protect itself from fraud in any way detracts from Kuwait's sovereignty. This is not a case in which Hijazi acted to defraud Kuwait, or even a Kuwaiti citizen or company, as well as the United States. Hijazi's conduct was directed at defrauding the United States Government, such that Kuwait would have no duty, or even motivation, to prosecute Hijazi therefor. Accordingly, the Court

does not find that the Kuwaiti Government's objection to its exercise of jurisdiction renders it unreasonable.

For the foregoing reasons, the Court finds that the exercise of jurisdiction over Hijazi comports with international law, and therefore with due process. The Court will now discuss whether the statutes under which Hijazi has been charged are to apply extraterritorially to his conduct such that jurisdiction is complete.

## II. Extraterritorial Application of the Major Fraud Act and Wire Fraud Statutes

The Second Superseding Indictment charges Hijazi with violations of the Major Fraud Act and the Wire Fraud statute.[11]  The Major Fraud Act provides:

> (a) Whoever knowingly executes, or attempts to execute, any scheme or artifice with the intent –
>
> (1) to defraud the United States; or
>
> (2) to obtain money or property by means of false or fraudulent pretenses, representations, or promises, in any grant, contracts, subcontract . . .as a subcontractor or supplier on a contract in which there is a prime contract with the United States, if the value of such . . . contract, subcontract . . . , is $1,000,000 or more shall . . . be fined not more than $1,000,000, or imprisoned not more than 10 years, or both.

18 U.S.C. § 1031.

The Wire Fraud statute provides for a fine and/or imprisonment for the use of "wire, radio, or television communication in interstate or foreign commerce" in furtherance of a fraudulent scheme.   18 U.S.C. § 1343

As noted above, the Government contends that Mazon and Hijazi schemed to defraud the United States by entering into an inflated subcontract on a prime

---

[11] Hijazi is also charged with aiding and abetting both crimes, in violation of 18 U.S.C. § 2.

contract to which the United States was a party.  It is undisputed that during the relevant time period, Hijazi, a Lebanese citizen, was in Kuwait and allegedly committed acts in violation of the statutes while in Kuwait.  On this point, it is clear that Hijazi had no direct contact with the United States except that he is alleged to have sent three e-mails to Mazon, the last of which (allegedly written in an attempt to cover up the pay-off) was opened in the United States.  Thus, the Government is attempting to prosecute Defendant for conduct that ostensibly took place in a foreign country – i.e. extraterritorially.

The Government first argues that this Court need not consider the extraterritoriality of the statutes in question because Mazon's conduct, some of which occurred in the United States, can be imputed to Hijazi.  In furtherance of the scheme to defraud the United States, the Government alleges that Mazon e-mailed KBR, an American corporation, regarding the fraudulent subcontract, that he attempted to deposit the kick-back in United States banks, and that he used his United States based e-mail to communicate with Hijazi.

The Second Superseding Indictment does not allege a conspiracy count.  The Seventh Circuit has held, however, that "[i]t is not essential that the indictment contain a separate count charging conspiracy in order to take advantage of the doctrines peculiar to conspiracy." *United States v. Wilson*, 506 F.2d 1252, 1257 (7th Cir. 1974).  One such doctrine is that co-conspirators can be held accountable for each other's actions.  *United States v. Wormick*, 709 F.2d 454, 461 (7th Cir. 1983).  Mazon's actions in furtherance of the scheme to defraud can thus be attributed to

Hijazi, even though he is a foreign national.  *Ford v. United States*, 273 U.S. 593, 622-624 (1927).  Thus, the Court finds that because part of the alleged scheme to defraud the United States took place in the United States, Hijazi may be prosecuted here.  *See e.g. United States v. Schmucker*-Bula, 609 F.2d 399 (7th Cir. 1980) (finding jurisdiction over a foreign national in a drug conspiracy case); *United States v. Leija-Sanchez*, 602 F.3d 797 (7th Cir. 2010).

In any event, the Court will still consider whether the charging statutes have extraterritorial application, as a majority of Hijazi's own conduct occurred overseas. (*See* Doc. 230 at 12-13).  Acts of Congress are not presumed to have extraterritorial application.  *Small v. United States*, 544 U.S. 385, 389 (2005).  This presumption may be overcome, however, if there is a clear, contrary, congressional intent to broaden a statute's application to extraterritorial conduct, s*ee generally*, *Small*, 544 U.S. at 394, and if such an application is consistent with international law. *Morrison v. National Australia Bank Ltd.*, __ U.S. __, 130 S.Ct. 2869, 2878 (2010) ("When a statute gives no clear indication of an extraterritorial application, it has none."); *United States v. Dawn*, 129 F.3d 878, 882 (7th Cir. 1997).  The text of the statute itself does not mention the extraterritorial reach of the act nor is there any relevant legislative history that would shed light on its reach.  *See Middleton v. City of Chicago*, 578 F.3d 655, 658-662 (7th Cir. 2009) (noting that courts must first look to the plain language of the statute and then to legislative history to determine congressional intent).

However, neither the lack of clearly expressed language within the statute nor the absence of legislative history may be fatal to this prosecution.  An exception to the presumption has been described in *United States v. Bowman*, 260 U.S. 94 (1922).  *Bowman* involved a scheme, hatched on the high seas, to defraud the United States in the aftermath of World War I.  The case involved a statute that generally made it a crime to defraud the government and that did not expressly state that it applied extraterritorially.  The Court noted that such criminal statutes "are not logically dependent on their locality for the government's jurisdiction, but are enacted because of the right of the government to defend itself against obstruction, or fraud wherever perpetrated, especially if committed by its own citizens, officers, or agents."  *Id.* at 98.

Thus,

> To limit their locus to the strictly territorial jurisdiction would be greatly to curtail the scope and usefulness of the statute and leave open a large immunity for frauds as easily committed by citizens on the high seas and in foreign countries as at home.  *Id.*

The practical result of *Bowman's* holding is that "judges must consider the language and function of the prohibition" in determining the extraterritorial reach of a criminal statute.  *Leija-Sanchez*, 602 U.S. at 799.  In this instance, the Major Fraud Act was designed to prevent fraud against the United States in the making of contracts in which the United States has an interest.   It fits squarely within the exception to the presumption outlined in *Bowman*.  The only caveat is that *Bowman* involved United States citizens acting abroad as oppose to a foreign national.  The Court nonetheless agrees with the Government that the import of *Bowman* does not

hinge on the nationality of the defendant but rather on the particular harm a statute means to prevent: fraud targeted at the United States itself.  *See United States v. Delgado-Garcia*, 374 F.3d 1337, 1345-1346 (D.C. Cir. 2004); *see also Strassheim v. Daily*, 221 U.S. 280, 284 (1911) (stating with respect to the jurisdiction of states: "Acts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, justify a state in punishing the cause of the harm as if he had been present at the effect, if the state should succeed in getting him within its power.").  This same reasoning applies to the wire fraud statute to the extent that it is used to prosecute frauds committed against the United States.

The *Bowman* Court also noted that this exception should only be applied when it fit within "the power and jurisdiction of a government to punish crime under the law of nations."  260 U.S. at 97-98.  However, as discussed *supra*, the Court believes that its jurisdiction over Hijazi is consistent with international law such that he may be charged under these statutes.  Therefore, the Court agrees with the Magistrate Judge, and finds that the Major Fraud Act and wire fraud statute may be applied extraterritorially to Hijazi's conduct.  Accordingly, this Court has jurisdiction over Hijazi.

### III.   Applicability of the Defense Cooperation Agreement

In his Motion to Dismiss the Second Superseding Indictment, Hijazi argued that the Defense Cooperation Agreement ("DCA") between the United States and Kuwait bars this Court from exercising criminal jurisdiction over him.  The DCA is a classified document such that Hijazi did not have access to its terms.  However, he

premised his argument on the fact that other "status of forces agreements" ("SOFA") like it, such as the NATO SOFA, would bar such jurisdiction. Hijazi also relied on the statements of the Kuwaiti Government that the DCA bars this Court's jurisdiction. In a formal communication to the Department of Justice on May 3, 2007, Kuwait's Ambassador to the United States stated:

> Upon reviewing the provisions of the Defense Cooperation Agreement (DCA), signed between Kuwait and the United States of America in 1991, we found that it did not grant the United States the right to practice its legal competence (i.e. application of US laws on the citizens of Kuwait or residents in the state of Kuwait, such as in the present case), with respect to acts committed on the territories of the State of Kuwait, except those related to US Army personnel, US civilians and company contractors. (Doc. 180-B).

The Kuwaiti Ambassador reiterated this position in a subsequent letter, in which he stated: "There is nothing in the DCA that would provide any basis for the United States to assert its criminal legal jurisdiction on citizens and residents of Kuwait . . ." and that "If the United States desires to exercise its jurisdiction over actions that occur in Kuwait, it can only do so pursuant to the terms set forth in the DCA." (Doc. 180-C). Finally, Hijazi obtained the opinion of Frederick C. Smith, a former career senior executive at the Pentagon who was personally involved in negotiating the DCA, who stated that "the Kuwaiti Government could rightfully consider it a violation of the DCA . . . for the United States to assert jurisdiction over a Kuwaiti national or a person ordinarily resident in Kuwait, who is not a member of the U.S. military, for acts occurring wholly or predominantly in Kuwait. (Doc. 180-D).

The Government objects to Hijazi's argument that the DCA bars this Court from asserting jurisdiction over Hijazi. According to the Government, "nothing in the DCA precludes or even discourages this prosecution." (Doc. 217 at 45). The Government argues that, because it is not purporting to exercise jurisdiction over Hijazi pursuant to the DCA, but rather under established principles of U.S. and international law, the DCA is immaterial to this case. In addition, while the Government is unable to comment on any of the actual provisions of the classified document, it notes that the NATO SOFA itself would also not bar jurisdiction in this case because the agreement does not prohibit jurisdiction on traditional grounds, but rather creates a new basis for jurisdiction over certain crimes. (Doc. 217 at 47 n. 11).

Magistrate Judge Cudmore obtained the DCA and engaged in an *in camera* review of the document. While the classified status of the document precluded the Magistrate from going into any detail, after reviewing the document he concluded that "the DCA is completely inapplicable to this criminal cause." (Doc. 230 at 40). Hijazi now argues that the Magistrate gave insufficient deference to the Kuwaiti Government's interpretation of the DCA, and that if the DCA fairly admits of two constructions, the construction favoring Hijazi's right to be free from prosecution is to be preferred. (Doc. 233 at 41-42).

While Hijazi is correct that Courts look to the "opinions of our sister signatories" when interpreting a treaty, "[t]he interpretation of a treaty, like the interpretation of a statute, begins with its text." *Abbott v. Abbott*, 130 S.Ct. 1983,

1990, 1993 (2010). Here, the Court agrees with the Magistrate that nothing in the text of the DCA indicates that it is not applicable to the instant proceedings. Therefore, the Court agrees with the Magistrate's conclusion and finds that the DCA does not bar it from exercising criminal jurisdiction over citizens of Kuwait such as Hijazi, and can be fairly interpreted to grant such jurisdiction in connection with contractual matters such as those underlying his prosecution.[12]   While it is foreclosed from discussing the reasons behind its textual interpretation due to the confidential nature of the document, the Court notes that it has taken into account the fact that the Kuwaiti Government strongly objects to Hijazi's prosecution, and its belief that the DCA serves as a bar thereto.  Despite these objections, the Court can find nothing in the text of the DCA which would suggest such a reading, and therefore its deference to Kuwait's interpretation is overcome.  *See United States v. Alvarez-Machain*, 504 U.S. 655, 663 (1992) ("In construing a treaty, as in construing

---

[12] The Court also recognizes Hijazi's argument that "In choosing between conflicting interpretations of a treaty obligation, a narrow and restricted construction is to be avoided as not consonant with the principles deemed controlling in interpretation of international agreements.   Considerations which should govern the diplomatic relations between nations, and the good faith of treaties, as well, require that their obligations should be liberally construed so as to effect the apparent intention of the parties to secure equality and reciprocity between them.  For that reason if a treaty fairly admits of two constructions, one restricting the rights which may be claimed under it, and the other enlarging, the more liberal construction is to be preferred." *Factor v. Laubenheimer*, 290 U.S. 276, 293-94 (1933).  Hijazi believes that the more liberal construction of the DCA would imply that the United States is barred from bringing this action against him.  The Court, however, believes the opposite.  The fact that the United States signs such SOFA agreements with most nations to which it sends troops suggests that the United States would not, in effect, make those territories zones in which foreign nationals could willingly and knowingly defraud or otherwise commit crimes against the United States without fear of punishment. Thus, as to the contracting parties, the Court believes the more liberal interpretation is the one allowing for jurisdiction.

a statute, we first look to its terms to determine its meaning."). The Court also notes that the Government is not asserting jurisdiction based upon the DCA, only that the DCA does not bar its otherwise existent jurisdiction to enforce its laws against persons who commit crimes against the nation itself.

## IV.   Impact of the Long Pre-trial Delay

Finally, Hijazi makes several arguments that the case against him should be dismissed based upon the length of time that has passed since he was charged. Hijazi's arguments are based upon the Sixth Amendment right to a speedy trial, and Federal Rule of Criminal Procedure 48(b).[13]   Magistrate Judge Cudmore considered Hijazi's claims and found them to be without merit.  (Doc. 230 at 45-52). Hijazi has objected to the Magistrate's ruling with respect to both claims,[14] so the Court must now consider them *de novo*.

### A. Sixth Amendment Right to a Speedy Trial

The Sixth Amendment of the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . ." When a defendant raises a claim pursuant to this provision, the Court applies

---

[13] Hijazi first argued that the Second Superseding Indictment should be dismissed pursuant to Rule 48(b) for lack of prosecution in his Motion to Dismiss Second Superseding Indictment. (Doc. 180). He later raised his speedy trial claim in a separately filed motion. (Doc. 174).

[14] In finding that Hijazi has objected to the Magistrate's R&R with respect to his lack of prosecution argument, the Court is generously construing Hijazi's Objections.  Hijazi makes no substantive arguments with respect to his Rule 48(b) claim, but merely cites to the Rule and directs the Court to the applicable section of his Reply Brief.  (Doc. 233 at 52).  However, as the Magistrate determined that Hijazi's Rule 48(b) claim was meritless for the same reasons as his Sixth Amendment claim, the Court will look to Hijazi's objections to the Sixth Amendment claim as pertaining to both.

the following four-part test, created by the Supreme Court in *Barker v. Wingo*, 407 U.S. 514, 519-20 (1972): (1) whether the delay before trial was uncommonly long; (2) whether the government or the defendant is more to blame for that delay; (3) whether, in due course the defendant asserted his right to a speedy trial; and (4) whether he has suffered prejudice as the delay's result. *See also U.S. v. Oriedo*, 498 F.3d 593, 597 (7th Cir. 2007). None of these factors are dispositive, however, and the Court must "engage in a difficult and sensitive balancing process" and consider them together with such other circumstances as may be relevant. *Barker*, 407 U.S. at 533.

Here, both parties agree that the pre-trial delay in this case, now over six years, is sufficiently long to be presumptively prejudicial such that an analysis of the other three factors is appropriate. *See id.* at 530 ("Until there is some delay which is presumptively prejudicial, there is no need for inquiry into the other factors that go into the balance."). Accordingly, the Court must look to these factors, as well as other relevant circumstances, to determine whether Hijazi's Sixth Amendment Right to a speedy trial has been violated.

**i.   Blame for the Delay**

The second factor under the *Barker* analysis asks "whether the government or the criminal defendant is more to blame for th[e] delay." *Doggett v. United States*, 505 U.S. 647, 651 (1992). This factor is often the most crucial to the determination of a speedy trial claim. *See United States v. Loud Hawk*, 474 U.S. 302, 315 (1986). Not surprisingly, Hijazi claims that the Government is at fault for

not making a serious effort to bring him to trial (Doc. 222 at 41-46); and the Government asserts that the fault lies with Hijazi because he has chosen to remain beyond its reach (Doc. 217 at 49-53). The Magistrate agreed with the Government, and found that Hijazi's choice to remain beyond the reach of the Government, despite the Government's due diligence, indicated that it he was the responsible party. (Doc. 230 at 48 ("A defendant lawfully living in a country with no extradition treaty, who is aware of an indictment against him, can be held responsible for the delay if he chooses to remain beyond that Government's reach.")). In his Objections to the Magistrate's R&R, Hijazi retreats slightly from his stance that the Government should have done more to garner control over him, but nevertheless states that the lack of an extradition treaty between the United States and Kuwait must be viewed as a "neutral" factor, which should be tallied against the Government. (Doc. 233 at 45). In addition, Hijazi claims that the Magistrate erred by using a "fugitive-like" rationale to find that he was the party to blame.

"A defendant has no duty to bring himself to trial; the [Government] has that duty." *Barker*, 407 U.S. at 527. This duty exists even if the accused is outside of the United States; in such a case the Government has a duty to seek extradition, unless such an effort would be futile. *See United States v. Walton*, 814 F.2d 376 (7th Cir. 1987). As the Seventh Circuit discussed in its Opinion in this case, "[a]lthough the Department of Justice formally asked the Kuwaiti authorities to turn Hijazi over to it, through a diplomatic note dated September 13, 2005, Kuwait has refused to grant that request. All indications in the record continue to support the conclusion

that the Government of Kuwait is unwilling to cooperate in this prosecution, insofar as it concerns Hijazi." *In re Hijazi*, 589 F.3d at 405.  Moreover, "Hijazi is under no obligation to travel to the United States, and as long as he does not enter the country, he cannot forcibly be brought before the Central District of Illinois . . . As we have already noted, there is no extradition treaty between the United States and Kuwait, and so the Kuwaiti government is well within its rights to decide what it wants to do with Hijazi." *Id.* at 407.  The Government has taken several other steps to seek to gain control over Hijazi, including issuing a "red notice" to INTERPOL, however as of this date it has been unsuccessful in its attempts.

Accordingly, the Court must decide the difficult question of who is to blame between a Government that has taken reasonable and diligent steps to secure a defendant for trial which have proved unsuccessful, and a defendant who lawfully and openly remains beyond the Government's control.  As the Seventh Circuit recognized, this is not a case in which Hijazi is a fugitive, illegally on the run from the United States Government.  *See Hijazi*, 589 F.3d at 412.  However, nor does the Court believe it to be a case in which the Government has failed to pursue Hijazi with reasonable diligence.  *See Doggett v. United States*, 505 U.S. 647, 656 (1992). Case law indicates that in circumstances such as these, the Government cannot be held to blame for the delay, and the factor must be weighed in its favor.  *See United States v. Ocampo*, 266 Fed. Appx. 63, 65 (2d Cir. 2008) (holding that the second factor weighed heavily in favor of the government when it was unable to extradite a defendant but took efforts to ensure his arrest upon entry to the United States);

*United States v. Corona-Verbera*, 509 F.3d 1105, 1115-16 (9th Cir. 2007) (holding second factor weighed against dismissal when delay was based upon the futility of extradition and the government took steps to arrest defendant upon entry to United States); *United States v. Tchibassa*, 452 F.3d 918, 926 (D.C. Cir. 2006) (holding that second factor weighed against defendant where the delay in his arrest was attributable primarily to his continued residence in an area over which the United States had no control and little influence); *see also United States v. Reumayr*, 530 F.Supp.2d 1200, 1206 (D.N.M. 2007) (stating that "courts have uniformly held the defendant, rather than the government, liable for delay caused by extradition proceedings or by other attempts to remain outside the United States," and finding that whether or not defendant was a fugitive was irrelevant to such consideration.).[15]

The Court agrees with these authorities, and with the thoughtful opinion of Magistrate Judge Cudmore.  While it is Hijazi's right to remain in Kuwait, and the Kuwaiti Government's right to choose not to deliver him to the United States, this cannot be weighed against the Government in determining why Hijazi has not yet been brought to trial.  The Government has acted diligently in seeking to obtain

---

[15] Hijazi argues that cases such as these are not relevant to the instant proceedings because they all entailed defendants who were fugitives from the United States, while he is not.  (Doc. 233 at 45-58).  However, even if all of these cases involved fugitive defendants (which they do not), none of the courts rely on the status of the defendant in determining the weight to be given to the cause for delay factor. Instead, the courts examine the conduct of the government, and if such conduct is reasonable and diligent, conclude that the factor must be weighed in its favor.

him and has therefore fulfilled its duty.  Therefore, the factor is to be weighed in favor of the Government and against dismissal.

### ii.   Assertion of Right

The next factor for the Court to consider is whether Hijazi asserted his right to a speedy trial in due course.  *Barker*, 407 U.S. at 520.  "The Supreme Court explicitly has made the quality of the defendant's assertion of the right not just a factor in the analysis, but one entitled to significant weight and one without which the claim will be difficult to prove."  *United States v. Oriedo*, 498 F.3d 593, 597 (7th Cir. 2007).  The Government argues that Hijazi has not validly asserted his right because, rather than appear in the United States to stand trial, he has "vigorously moved to dismiss the indictment from overseas and has steadfastly refused to subject himself to U.S. jurisdiction."  (Doc. 217 at 54).  The Magistrate agreed, finding that while Hijazi's motion to dismiss based on speedy trial concerns constituted an assertion of his right, the assertion is hollow because Hijazi refuses to appear for trial and the Government cannot compel his appearance.  (Doc. 230 at 49).  In his Objections, Hijazi argues that he has not forfeited his right to a speedy trial simply because he resides overseas, nor is he required to give the Court jurisdiction over his person in order to claim a Sixth Amendment violation.  (Doc. 233 at 45-56).[16]

---

[16] Hijazi also argues that *Klopfer v. State of North Carolina*, 386 U.S. 213 (1967) mandates dismissal of the indictment because "an indictment left pending indefinitely constitutes a Sixth Amendment violation."  (Doc. 233 at 49).  Hijazi attributes this quote as a holding of the Seventh Circuit, however the quoted language comes only from that court's parenthetical regarding the holding of *Klopfer*.  The Court agrees with the Magistrate that *Klopfer* is not controlling here

It is not disputed that Hijazi first noted his intention to assert his right to a speedy trial on December 21, 2007, in his Motion to Dismiss Second Superseding Indictment (Doc. 180 at 30 n. 6), where he indicated that he would be asserting his right to a speedy trial in this matter.  Nine months later, on September 3, 2008, Hijazi filed a formal Motion to Dismiss Based on Sixth Amendment Right to a Speedy Trial.  (Doc. 174).  The question, therefore, is not whether his assertion of his right was timely, but instead whether it is meaningful, in light of the fact that the cause for delay in trial is his refusal to come to court.

Hijazi cites to two cases for the proposition that a non-fugitive defendant who resides overseas does not forfeit his right to demand speedy trial.  (Doc. 233 at 48). However, in both of those cases, the reason that the defendants had not been tried earlier was due to the government's negligence in locating them or informing them of the charges pending against them.  *See United States v. Judge*, 425 F.Supp. 499 (D. Mass. 1976) (finding that the Government unnecessarily delayed bringing the defendant to trial when it knew of the defendant's whereabouts overseas and made no effort to inform him that he was under indictment or bring him to trial); *United States v. McDonald*, 172 F.Supp.2d 941, 949-50 (finding that the delay in trial was attributable to the Government not promptly seeking extradition, and that defendant had actually sought to negotiate his return to the United States on more

---

(an issue the Seventh Circuit had no need to consider), because in this case Hijazi is not powerless to move the case along, as was the defendant there.  *See Klopfer*, 386 U.S. at 216 (discussing the fact that, the current procedural posture of the case against Klopfer left him "no means by which he can obtain a dismissal or have the case restored to the calendar for trial.").  Hijazi's indictment will no longer be pending against him should he choose to come to trial.

than one occasion).  Here, the Court has already determined that the Government is not to blame for the delay in bringing Hijazi to trial.  Moreover, the Government points the Court to *United States v. Manning*, 56 F.3d 1188, 1195 (9th Cir. 1995), a case in which the Ninth Circuit held that when a defendant could have avoided post-indictment delay by returning to the United States, he could not then complain of the delay that he himself had caused.

The Court finds the *Manning* rationale and the rationale of the Magistrate to be convincing.  If Hijazi truly wants a speedy trial, and desires to assert his right thereto, he cannot at the same time refuse to show up for it.  Accordingly, the Court agrees with the Magistrate that Hijazi's assertion of his Sixth Amendment right is "hollow" and without merit, and thus this factor also weighs in favor of the Government.

### iii.    Prejudice

The final factor to be considered is whether Hijazi has suffered prejudice as a result of the delay in bringing him to trial.  *Barker*, 407 U.S. at 519-20.  When the Government pursues a defendant with reasonable diligence, and is therefore not to blame for the delay, the defendant must "show specific prejudice to his defense." *Doggett v. United States*, 505 U.S. 647, 656 (1992) ("if the Government had pursued [the defendant] with reasonable diligence from his indictment to his arrest, his speedy trial claim would fail.  Indeed, that conclusion would generally follow as a matter of course however great the delay, so long as [the defendant] could not show specific prejudice to his defense."); *see also Manning*, 56 F.3d at 1194-95 ("Whether

[defendant] must show actual prejudice depends on whether it is he or the government who is responsible for the delay.").

Hijazi argues that he has suffered the requisite prejudice to have his case dismissed. He relies on the "litany of substantial hardships contained in the Seventh Circuit's decision," as well as the potential prejudice to his defense. (Doc. 233 at 51-52). In its Opinion, the Seventh Circuit did state, as Hijazi quotes, that the continued indictment over him would "make it very risky for him to ever leave Kuwait, which is not his native country . . . ." *In re Hijazi*, 589 F.3d at 413. However, this was couched in terms of the risk Hijazi faced if the Court denied his motions to dismiss, and not in terms of Sixth Amendment prejudice. *See id.* (Preceding the above quote with, "[w]e think that the district court took too narrow a view of the adverse consequences Hijazi would suffer if he loses on his motions to dismiss."). Moreover, when the Seventh Circuit discussed the prejudice to him earlier in its Opinion, this was in terms of whether this Court should rule upon his motions to dismiss and determine whether it had the authority to command his appearance, and not upon whether the indictment should actually be dismissed. *Id.* at 407. Accordingly, the Seventh Circuit's opinion as to the prejudice being suffered by Hijazi is not binding upon this Court's determination of whether the indictments should be dismissed pursuant to the Sixth Amendment. *See id.* at 410 ("we express no view about the arguments Hijazi has presented based on the Sixth Amendment guarantee of a speedy trial.").

The Court does not dispute that Hijazi may be suffering personal prejudice as a result of the indictments hanging over him.  However, as the Supreme Court stated in *Doggett*, because the delay is not due to the Government's negligence or bad faith, Hijazi must show "specific prejudice to his defense."  505 U.S. at 656. Hijazi has not done so.  While he states that the delay is "likely to have prejudiced" his defense, he relies only upon the presumption of prejudice established by courts when a lengthy delay is caused by the Government.  Such potential prejudice is insufficient when the delay is of Hijazi's making.  While Hijazi argues that it may be difficult to secure witnesses for trial because they live overseas, this issue would arise regardless of the date of Hijazi's trial.  (Doc. 222 at 50).  Moreover, as the Government has pointed out, court records have already been established as to much of the witness' testimony via the trial of his co-defendant, and therefore witnesses could not rely on a "lack of memory" if the case was brought to trial.

In sum, the Court does not find that Hijazi has suffered enough prejudice to overcome the fact that the delay is of his own making.  Accordingly, the Court agrees with the Magistrate's assessment of Hijazi's Sixth Amendment claim, and DENIES Hijazi's Motion to Dismiss Based on Sixth Amendment Right to a Speedy Trial (Doc. 174).

### B. Federal Rule of Criminal Procedure 48(b)

Hijazi has also sought to have the indictments against him dismissed for lack of prosecution, pursuant to Rule 48(b) of the Federal Rules of Criminal Procedure. Rule 48(b) provides: "The court may dismiss an indictment, information, or

33

complaint if unnecessary delay occurs in: (1) presenting a charge to a grand jury; (2) filing an information against a defendant; or (3) bringing a defendant to trial." The Rule "is a restatement of the inherent power of the court to dismiss a case for want of prosecution," and that power is not circumscribed by the Sixth Amendment. *United States v. Clay*, 481 F.2d 133, 135 (7th Cir. 1973). Still, Rule 48(b) is driven by the "same general considerations as the Sixth Amendment," and dismissal is appropriate only where there is delay that is purposeful or oppressive. *United States v. Ward*, 211 F.3d 356, 362 (7th Cir. 2000).

The Magistrate found that Hijazi's Rule 48(b) claim was without merit because the delay here is "attributable to Hijazi's choice to remain beyond the Government's reach." (Doc. 230 at 51). While the Magistrate acknowledged that this was a lawful choice for Hijazi to make, he noted that such choice was not without consequences – that is, the delay in his trial. (Doc. 230 at 51). Hijazi has not made any objections specific to his Rule 48(b) claim, but merely seeks to incorporate his objections to his speedy trial claim thereto. (Doc. 233 at 52). Accordingly, for the same reasons the Court has denied his request to dismiss for lack of speedy trial, the Court also finds Hijazi's claims of lack of prosecution to be without merit.

## CONCLUSION

For the foregoing reasons, the Report and Recommendation of Magistrate Judge Cudmore (Doc. 230) is AFFIRMED, and Hijazi's Motion to Dismiss Indictment (Doc. 15) Motion to Dismiss Second Superseding Indictment (Doc. 131)

and Motion to Dismiss Based on Sixth Amendment Right to a Speedy Trial (Doc. 174) are DENIED.  IT IS SO ORDERED.

Entered this <u>18th</u> day of July, 2011.

s/ Joe B. McDade
_____
JOE BILLY McDADE
United States Senior District Judge
